J-S64046-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C.R. A/K/A M.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: O.R., SR., FATHER | : : : : : : | |
| | : | No. 1896 EDA 2018 |

Appeal from the Decree Entered June 13, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No: CP-51-AP-0001060-2017

BEFORE: BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY OLSON, J.:                    **FILED DECEMBER 11, 2018**

O.R., Sr. ("Father") appeals from the decree entered June 13, 2018, granting the petition filed by the Philadelphia Department of Human Services ("DHS") seeking to involuntarily terminate his parental rights to his minor, female child, M.C.R. a/k/a M.R., born in April 2009 ("Child"), with V.R. a/k/a

V.Y.R. ("Mother"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1,2]  We affirm.

The trial court accurately and aptly set forth the factual background and procedural history of this case in its opinion filed pursuant to Pa.R.A.P. 1925(a), which we adopt herein.   Trial Court Opinion, 8/24/18, at 1-8. Importantly, on May 9, 2018, the trial court held an evidentiary hearing on the termination petitions with regard to Mother and Father.  Attorney Stuart Maron represented Child as her Child Advocate/Guardian *ad Litem* ("GAL"),

---

[1] The trial court also entered an order on June 13, 2018 that changed Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351. This order was filed at a different trial court docket number than the decree granting the petition for involuntary termination.  Originally, Father filed a single notice of appeal from both the decree and the order which contained both docket numbers.  This Court issued a rule to show cause why the appeal should not be quashed as the notice of appeal did not comply with Pa.R.A.P. 341(a) which requires that separate notices of appeal must be filed at both docket numbers. Order, 9/4/18. **See Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018).  In Appellant's reply to the show cause order, counsel for Father indicated that Father was only appealing the decree which terminated his parental rights and that he was not appealing the goal change order. Appellant's Reply to Order to Show Cause, 9/13/18.  As Father is only appealing the decree entered at docket number CP-51-AP-001060-2017, we shall not quash this appeal and we amend the caption accordingly.

[2] In a separate decree entered June 13, 2018, the trial court also involuntarily terminated the parental rights of Mother to Child pursuant to section 2511(a)(2), (5), (8), and (b) of the Adoption Act.  Mother is not a party to this appeal, but has filed a separate appeal, assigned Docket No. 2037 EDA 2018, which we address in a separate Memorandum.

and Attorney Charles Andrew Rosenbaum as her special legal counsel.[3]  At the hearing on May 9, 2018, DHS presented a number of witnesses on its behalf. Both Mother and Father were present, were represented by counsel, and testified on their own behalf.  Both legal counsel for Child and the GAL were present, but Child was not present, and her counsel did not offer her preferred outcome of the proceedings.  The court continued the hearing to June 13, 2018, so that it could hear testimony regarding Child's preferred outcome.  At the conclusion of the hearing on June 13, 2018, the trial court entered its termination decrees and goal change order.

On June 21, 2018, Father, through his trial counsel, Attorney Julie Hillman Rose, filed an appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  On July 3, 2018, the trial court granted Attorney Rose's motion to withdraw as counsel for Father. On July 11, 2018, the trial court appointed Attorney Mario D'Adamo, III, as Father's counsel, and directed him to file a supplemental concise statement

_____

[3] In **In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017) (plurality), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding.  The Court defined a child's legal interest as synonymous with his or her preferred outcome.  Here, Child had both legal counsel and a GAL, and her preferred outcome, which, at times, is to return to the sexually abusive situation in her parents' home, is part of the record. **See** N.T., 5/9/18, at 29, 66; N.T., 6/13/18, at 7.  Accordingly, the mandates of **L.B.M.** are satisfied as to the ascertainment of Child's preferred outcome.

within 21 days. Attorney D'Adamo filed the concise statement on August 2, 2018.

In his brief on appeal, Father raises the following issues:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, O.R.[,] pursuant to 23 Pa.C.S.A. [§] 2511(a)(2) where Father presented evidence that he has remedied his situation by, taking parenting classes and mental health treatment counselling and classes at SAGE and has the present capacity to care for [C]hild[?]

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, O.R.[,] pursuant to 23 Pa.C.S.A. [§] 2511(a)(5) where evidence was provided to establish that [C]hild was removed from the care of [] Father and Father is now capable of caring for [C]hild[?]

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, O.R.[,] pursuant to 23 Pa.C.S.A. [§ 2511 (a)(8)] where evidence was presented to show that Father is now capable of caring for [C]hild after he completed parenting classes, receiv[ed] mental health treatment and participat[ed] in SAGE[?]

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, O.R.[,] pursuant to 23 Pa.C.S.A. [§] 2511(b) where evidence was presented that established [C]hild had a bond with [] Father[?]

Father's Brief at 7.

In reviewing an appeal from the termination of parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate

courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Pennsylvania Supreme Court] discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some internal citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.*, *quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will consider section 2511(a)(2) and (b).

In his brief, Father argues that the trial court erred when it terminated his parental rights to Child under section 2511(a)(2) because the evidence presented at trial showed that he had remedied the conditions that caused Child to be placed in foster care. Father's Brief at 9 and 11-12. Citing **In re Adoption of C.S.**, 761 A.2d 1197, 1201 (Pa. Super. 2000), Father asserts that parental rights cannot be terminated because Child was removed from the care of her parents because of parenting and housing problems. Father's Brief at 12. Father claims that he has remedied his problems and is complying with his Single Case Plan goals. *Id.* Father asserts that he is working towards mental health treatment and continues his attendance at SAGE; he has completed parenting classes; and, he was consistent with visitation with Child. *Id.* With regard to section 2511(b), Father contends that Child's wishes were never taken into account. *Id.* at 13. Father asserts that the trial court should have given therapeutic visits and/or Parent Child Interactive therapy, along with Mother, so that both parents could continue to have visitation with Child. *Id.* at 13-14. Father claims that the termination of his parental rights does not serve Child's best interests. *Id.* at 14.

Section 2511 provides, in relevant part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

   (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

 **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

   As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986), *quoting In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In*

*re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotations omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests).

Our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) *quoting* *In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). The Supreme Court stated, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *See In re: T.S.M.*, 71 A.3d at 267 *quoting* *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting).

While Father may claim to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). We stated in *In re Z.P.*, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his

child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004).

Here, our review of the record demonstrates that there is sufficient, competent evidence in the record that supports the trial court's factual and legal determinations. Thus, we will not disturb the trial court's decision. ***In re Adoption of S.P.***, 47 A.3d at 826-27. Accordingly, we affirm the trial court's decree terminating Father's parental rights to Child pursuant to section 2511(a)(2) and (b) of the Adoption Act on the basis of the well-reasoned and thorough analysis set forth in Judge Deborah L. Canty's August 24, 2018 opinion. ***See*** Trial Court Opinion (Father), 8/24/18, at 1-19. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Canty's August 24, 2018 opinion.

Decree affirmed. Jurisdiction relinquished.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/11/18

- 11 -

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION[1]

IN RE: M.R. a/k/a M.C. R, a minor     : CP-51-AP-0001060-2017/ CP-51-DP-0001962-2016
    :
    : FN-001617-2016
    :
APPEAL OF: O.R.. a/k/a, O.R. Sr., father     : Superior Court No. 1896 EDA 2018

## OPINION

### INTRODUCTION

O.R. a/k/a O.R. Sr. ("Father") appeals from the decree and order entered by this Court on June 13, 2018, granting the petition filed by the Philadelphia Department of Human Services ("DHS") involuntarily terminating his parental rights to his minor female child, M.R. ("Child"). After a full hearing on the merits, this Court found that clear and convincing evidence was presented to terminate the parental rights of Father.[2] As discussed in greater detail below, the trial court terminated Father's parental rights because Father, during nearly two years that the Child was in the custody of DHS, did not complete his Family Service Plan ("FSP") objectives also known as Single Case Plan ("SCP") objectives, nor did he complete any of the

---

[1] Father's parental rights were involuntarily terminated on June 3, 2018. At the outset of the termination hearing held on May 9, 2018, Father made a request for new counsel but after reviewing the court docket his request was denied by this Court. On June 21, 2018, Father through his counsel filed an appeal, alleging ineffective counsel in his Pa.R.A.P. 1925(b) Statement of Matters Complained. Simultaneously, Father's counsel filed a Motion to Withdraw as Counsel, which this Court granted July 3, 2018, New counsel was administratively appointed on or about July 3, 2018. Father's new counsel was ordered to provide this Court with a Pa.R.A.P. 1925(b) Statement within twenty-one days of administrative appointment. Father's new counsel filed a Statement of Matters Complained on August 2, 2018.

[2] Mother's parental rights were also involuntarily terminated June 13, 2018, and an appeal followed which will be addressed separately.

recommendations from his Parenting Capacity Evaluation ("PCE"), and he failed to establish a positive and healthy relationship with his daughter, who expressed and demonstrated fear of Father before, during and after visits with him. Furthermore, the Child, who was nine years old at the time of the hearing, was doing well in the pre-adoptive home of her foster mother who has stabilized the Child's behaviors.

In light of Father's failure for almost two years to meet his SCP objectives, his failure to comply with Court Orders that were in place to protect the Child, his inability to demonstrate safety and protective capacities, and the lack of a positive, healthy, paternal relationship with the Child, the trial court properly granted DHS's Petition to Terminate.


## TERMINATION HEARING

On November 31, 2017, DHS filed Petitions to Involuntarily Terminate Father's Parental Rights and to Change the Child's Goal to Adoption. On May 9, 2018, this Court heard testimony on DHS's Petitions to Terminate Father's Parental Rights and the Goal Change to Adoption and held its decision in abeyance pending an investigation and conversation with the Child by her Special Child Advocate, Mr. Charles Rosenbaum, Esquire. Mr. Rosenbaum was solely responsible for gaging and presenting the Child's wishes to this Court for the purpose of the Termination of Parental Rights and Goal Change Hearings. (N.T. 5/9/2018, pgs. 1-118). On June 13, 2018, this Court heard testimony from Mr. Rosenbaum, who presented the Child's wishes followed by this Court's decision to terminate parental rights and change the goal to adoption. (N.T. 6/13/2018, pgs. 1-22).

Katherine Holland, the City Solicitor ("City"), presented testimony from multiple witnesses, which included: Psychologist, Dr. Erica Williams, Community Umbrella Agency ("CUA") current and past supervisors, John Hall and Jennifer Harris, respectively, the current CUA Case Manager, Shannin Hawkins, and the CUA Visitation Coach, Raymond Nichols, all of whom this Court found credible. The relevant testimony is stated below.

The City first presented the testimony from Dr. Williams, who performed a PCE of Father in November 2017. Dr. Williams testified that she remained concerned about Father's capacity to provide safety and permanency for the Child as the issues present during the evaluation had not yet been resolved. (N.T. 5/9/2018, pgs. 40-44). Specifically, Father had not participated in the Child's therapy which would focus on the sexual abuse that led to the Child's removal from Father. (N.T. 5/9/2018, p. 41 at 12-21). Dr. Williams remained concerned also because Father lacked a comprehensive and concrete home plan, the space Father lived in had been deemed inappropriate and because per Father, he was unable to receive children at his home. (N.T. 5/9/2018, p. 41 at 14-17). Also concerning to Dr. Williams was that Father also did not have any income. (N.T. 5/9/2018, p. 41 at 14-15). Extremely concerning to Dr. Williams was Father's lack of accountability as to the reasons why the Child was removed from his home. (N.T. 5/9/2018, p. 41 at 22-25 and p. 42 1-6). Particularly, Father failed to understand that even after being granted the opportunity to allow the Child to remain in the home following the sexual assault, it was Father who failed to protect the Child as Father allowed on-going communication between the Child and the perpetrator of the sexual assault. (N.T. 5/9/2018, p. 41 at 22-25 and p. 42 1-10).

The next witness, Mr. John Hall, the current CUA case manager supervisor, testified that in July of 2016 DHS received a Child Protective Services ("CPS") report that the Child was

sexually abused by a sibling. (N.T. 5/9/2018, p. 51 at 14-16). Subsequently, DHS received a General Protective Services ("GPS") report in August of 2016, of inadequate housing, parents admitting to a roach infestation, concerns with the physical structure of the home, and that Father violated a Delinquent Court Stay-Away Order by allowing the Child to remain in contact with the perpetrator who no longer resided in the home. (N.T. 5/9/2018, p. 51 at 17-25 and p. 52 at 1-7). As a result, an Order of Protective Custody ("OPC") was obtained and the Child has remained in placement for approximately the last twenty months. (N.T. 5/9/2018, p. 52 at 5-19).

Mr. Hall also testified that not only had SCPs been given to Father for the life of the case, that Father was invited to attend the SCP meetings, and that the SCP objectives had been explained to Father throughout the duration of the case. (N.T. 5/9/2018, p. 52 at 23-25 and p. 53 at 1-19). Father's objectives included: attend Parent Action Network SAGE program, attending the domestic violence program at MENERGY, attend the Achieving Reunification Center ("ARC") for parenting, housing, employment, to complete a PCE, and to have visitation with the Child. (N.T. 5/9/2018, p. 56 at 20-25). Even though Father had been referred to the SAGE program for eighteen months, he had just begun consistently attending March 1, 2018. (N.T. 5/9/2018 p. 54 at 22-25 and p. 55 at 1-11). Father completed the PCE. (N.T. 5/9/2018 p. 57 at 1-3). CUA referred Father to MENERGY for domestic violence throughout the life of the case however, not only had father denied that he needed the program and ultimately never completed the program, MENERGY required that Father first complete an anger management class before attending MENERGY, which was due to Father causing a conflict with the MENERY staff. (N.T. 5/9/2018 p. 57 at 7-25 and p. 58 at 1). Father never completed anger management. (N.T. 5/9/2018 p. 57 at 22-24).

Regarding the ARC programs, Father completed parenting however, there were still concerns about his ability to parent as he subsequently engaged in inappropriate behaviors with the Child which rose to the level of grave threat and resulted in suspension of visitation just two months before the termination hearing. (N.T. 5/9/2018 p. 58 at 9-21 and p. 56 at 24-25). In reference to housing, Father was still living in the home from which the Child was removed and that was found to be deplorable and still in need of an up-to-date assessment. (N.T. 5/9/2018 p. 58 at 22-25 and p. 59 at 1-6). Lastly, Father had not provided any employment verification. (N.T. 5/9/2018 p. 59 at 7-10).

With respect to the visitation, it was suspended March 14, 2018 by this Court and the visits were never reinstated. (DRO 3/14/2018). Mr. Hall testified that the Child had not had any visits with Father since March 9, 2018 and that of the behavioral issues the Child displayed, to his knowledge, none of them were related to not seeing her parents. (N.T. 5/9/2018, p. 61 at 3-12). Mr. Hall opined that the Child has positive interaction with the foster parent, that the Child likes the foster parent, that the foster parent is meeting the Child's needs, that the Child's problematic behavior stabilized since being with the foster parent, and that the Child's behavior increased when temporarily removed from the Foster Parent for a brief Respite Home Placement.[3] (N.T. 5/9/2018 p. 60 at 24-25, p. 61 at 1-18, p. 62 at 11-25 and p. 63 at 1).

Finally, Mr. Hall testified that, in his opinion, the Child would not suffer any irreparable harm if Father's rights were to be terminated. (N.T. 5/9/20118, p. 63 at 2-6). Mr. Hall based his opinion upon the fact that the Child does not have a positive healthy relationship with Father, and also based upon the fact that the Child's therapist does not believe that they should have any

---

[3] Mr. Hall testified that the Child was temporarily removed from her pre-adoptive foster home and temporarily placed into Respite Care after what seemed to be a retaliatory phone call that was made to DHS with false allegations, causing a DHS Investigation which was determined to be invalid. The Child returned to the pre-adoptive foster home. (N.T. 5/9/2018 pgs. 61-62). The report was determined to be invalid. (N.T. 5/9/2018 p. 62).

contact presently (N.T. 5/9/2018, p. 63 at 10-25 and p. 64 at 1). Furthermore, during Mother's cross examination and the City's re-direct examination, Mr. Hall based his opinion on the fact that the Child stated that she wished to go home so that her brother could sexually assault her again. (N.T. 5/9/2018 p. 66 at 3-19).

The third witness, Ms. Jennifer Harris, testified that she was the CUA case manager supervisor from May 2017 to about January 2018. (N.T. 5/9/2018 p. 68 at 22-23). Ms. Harris said that Father was made aware of his objectives throughout the life of the case by her staff as there was regular communication about the SCP objectives. (N.T. 5/9/2018 p. 68 at 25 and p. 69 at 1-3).

The fourth witness presented by the City was Ms. Shannin Hawkins, the current CUA case manager who took over the case approximately six months before the termination hearing. (N.T. 5/9/2018 p. 75 at 9-16). Ms. Hawkins testified that she discussed the Child's interaction with Father and the Child demonstrated that Father would tongue kiss the Child during visits. (N.T. 5/9/2018 p. 77 at 2-8). Based on this interaction during several visits, Ms. Hawkins testified that she was concerned about the Child being in Father's care and opined that the Child would not suffer any irreparable harm should Father's rights be terminated. (N.T. 5/9/2018 p. 77 at 11-25). Ms. Hawkins also based her opinion on the fact that Father and Child do not have a positive healthy paternal relationship and that the Child does not talk about Father at all. (N.T. 5/9/2018 p. 77 at 22-24 and p. 81 at 20-21).

Regarding Father's objectives, it is important to recognize that on Father's cross-examination of Ms. Hawkins, Ms. Hawkins testified that Father made outreach on May 4, 2018 to inform her that he began participating in the following: ARC as of April 19, 2018, individual therapy at Community Counsel since February 2018, SAGE in March 2018. (N.T. 5/9/2018 p. 78

at 12-25 and p. 79 at 10-25). However, during the City's re-direct examination, Ms. Hawkins testified that Father had not shown any documentation from ARC or Community Counsel. (N.T. 5/9/2018 p. 82 at 7-12).

Ms. Hawkins also testified that Father was denied at MENERGY due to Father's physical aggression and also due to the fact that Father did not want the MENERGY services. (N.T. 5/9/2018 p. 80 at 6-12).

The City's final witness, Mr. Raymond Nichols, the CUA Visitation Coach, who assists with transporting the Child for visits, testified that he has concerns about the interaction between Father and Child. (N.T. 5/9/2018 p. 84 at 15-25, pgs. 85-86 and p, 87 at 1-11). One concern Mr. Nichols expressed is the intimidation on Father's part towards the Child, specifically that while in Father's presence, the Child would revert back to childish stance, unable to comprehend communication and unable to fully speak, sometimes not anything at all, when addressed, which he contrasted with the Child's normal conversation with when he is alone with the Child. (N.T. 5/9/2018 p. 85 at 21-25 and p. 86 at 1-8). Mr. Nichols also testified that the Child would urinate or defecate on herself before or after the visits with Father and that when asked, the Child admitted to being scared because Father curses and screams at the Child and Mother during visits. (N.T. 5/9/2018 p. 86 at 9-17 and p. 88 at 19-24). Another concern of Mr. Nichols is that Father would kiss the Child on the lips, sometimes multiple times at once. (N.T. 5/9/2018 p. 86 at 17-20). Additionally, Mr. Nichols was concerned that Father would prop the Child on his lap while on the floor and would adjust the Child upon his lap and that he also has touched the Child's behind a couple of times. (N.T. 5/9/2018 p. 86 at 21-23). According to Mr. Nichols, Father did not listen to Mr. Nichol's redirection of these behaviors. (N.T. 5/9/2018 p. 86 at 24-25 and p. 87 at 1-3). Based upon the reasons above, Mr. Nichols opined that the Child would not

suffer any irreparable harm if Father's rights were terminated and that they do not have a positive, healthy paternal relationship. (N.T. 5/9/2018 p. 88 at 25 and p. 89 at 1-6).

At the end of the hearing, this Court granted DHS's Petition to Termination of Parental Rights of Father.

## APPELLANT'S ARGUMENTS[4]

In his Statement of Matters Complained of on Appeal, Father avers the following:

1. Appellant avers that the Trial Court erred by changing the Child's goal to adoption and terminating parental rights of Appellant, Father under 23 Pa.C.S.A. section 2511 (a)(2) and (5) and (8).

2. Appellant avers that the Trial Court erred in Terminating Appellant's Parental Rights under 23 Pa.C.S.A. section 2511 (a) (2), the evidence having been insufficient to establish Father caused child to be without essential parental care, nor could that not have been remedied.

3. Appellant avers that the Trial Court erred by finding, under 23 Pa.C.S.A. section 2511 (b), that termination of Appellant's rights best serves the Child's development, physical and emotional needs and welfare.

## STANDARD OF REVIEW

When reviewing an appeal from a decree terminating parental rights, an appellate

---

[4] Although not reflected here, prior counsel, Julie Rose, (who upon request, was vacated after filing the appeal) averred in the initial Statement of Matters Complained: "[I] provided ineffective assistance of counsel by not calling witnesses and failing to competently cross-examine witnesses". This followed from Father's assertion during the May 9, 2018 termination hearing that he wanted a new attorney. (N.T. 5/9/2018 p.15 at 9-25, p. 16 at 1-15, p. 26 at 21-25, p. 27 and p. 28 at 1-10). It is important to note that Father did testify at the termination hearing however, he did not appear to Court with any witnesses of his own. (N.T. 5/9/2018 pgs. 101-106). The Court reviewed the record and took note that Counsel had been assigned to the case since the adjudicatory hearing which occurred on 9/16/2018, and had been present at almost every listing, all of which occurred without issue as to competent representation and without any requests for new counsel. (Id.). This Court did not find Father's reasons to have new counsel appointed credible and determined that Father's last minute request for new counsel was a stall tactic to try to prevent the termination hearing from going forward, thus his request was denied. (Id.). This trial court will not usurp an attorney's trial strategy and believes that DHS met its burden by clear and convincing evidence sufficient to terminate Father's parental rights and to change the goal to adoption.

Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 Pa.C.S.A. §2511(a) in order to affirm a termination of parental rights. In re D.A.T., 91 A.3d 197 (Pa. Super. 2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual finding are supported, the appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 Pa. Super. 54, 111 A.3d 1212, 1215 (2015).

A. **The Trial Court Properly Found that the Department of Human Services Met Its Burden by Clear and Convincing Evidence To Terminate Father's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(2),(5) and (8)[5].**

---

[5] 23 Pa.C.S.A §2511(a)- General Rule- the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

    (2)   The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

Termination of parental rights is governed by 23 Pa.C.S.A. §2511. In termination cases, the burden is upon DHS to prove by clear and convincing evidence that its asserted grounds for seeking termination of parental rights are valid. In the Interest of B.C., 36 A.3d 601, (Pa. Super. 2012). In the instant case, DHS's petition asked the Court to terminate Father's parental rights under §2511(a)(1),(2),(5), and (8). However, this Court terminated Father's parental rights pursuant to §2511(a)(2),(5), and (8) only and therefore, will only address those sections in this opinion. In light of Father's failure for almost two years to meet his FSP objectives also known as his SCP objectives, his failure to complete or demonstrate compliance with the recommendations from his PCE, and his inability to establish a non-toxic and non-sexually explicit relationship with the Child, the trial court properly granted DHS's Petition to Terminate.

1. **The Trial Court Properly Granted the Petition to Terminate Parental Rights Pursuant to 23 Pa.C.S.A. § 2511(a)(2).**

Section 2511(a)(2) requires that "repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23

---

(5)    The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8)    The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

Pa.C.S.A. §2511(a) (2). These grounds are not limited to affirmative misconduct; "to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties." In re N.A.M., 33 A.3d 95 (Pa. Super. 2011).

The Supreme Court, in In re Geiger, 459 Pa. 636, 331 A.2d 172, 174 (1975), enunciated the fundamental test in termination of parental rights under what is now 2511(a)(2) as requiring the Petitioner to prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied."

Parental duty requires that the parent act affirmatively with a good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. In re E.M., 908 A.2d 297 (Pa. Super. 2006). In other words, a trial court can find an incapacity to parent by finding affirmative misconduct, acts of refusal to parent as well as an incapacity to parent. In re S.C.B., 990 A.2d 762 (Pa. Super. 2010). Furthermore, §2511(a)(2) emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. In re Z.P., 994 A.2d 1108 (Pa. Super. 2010).

This Court found clear and convincing evidence that Father failed and refused to perform parental duties, failed to address the conditions which brought the Child into placement, and lacks the capacity to adequately provide care, control and a stable environment necessary for this nine year old Child. The Father's failure to achieve and maintain his objectives and failure to provide the basic needs, safety, and protection of the Child even with the assistance of services,

demonstrate his incapacity and refusal to parent. In addition, there is no question that Father's failure to maintain healthy contact and display appropriate behavior during visits with the Child demonstrated that Father left his Child without parental care necessary for her physical or mental well-being.

Father never demonstrated that he was able to provide proper parental care for his Child. At the time of the termination and goal change hearings, Father had already undergone a PCE approximately four months prior (in November 2017) and it concluded that he did not present with the capacity to parent the Child. Particularly, Father stated that he was without income and that his housing was inappropriate and therefore he was unable to receive [the Child] in his home. The PCE recommended that Father have a suitable financial plan and suitable housing in order to achieve permanency. At the time of the termination hearing, Father had not obtained suitable housing and had not presented a financial plan or other information to show he was able to provide permanency. In addition to this inability to provide permanency for the Child, Father did not have the capacity to provide safety for the Child. Particularly, at the time of the PCE, Father had yet to fully understand or accept that the Child had been removed from his care because he violated the Court Order, plans and services that were put into place to keep the Child away from the perpetrator in all forms, including telephonic communication. The PCE recommended that Father participate in [the Child's] therapeutic program and in SAGE in order to achieve and demonstrate the appropriate protective capacity. At the time of the termination hearing, Father had just began attending the SAGE program after having been referred for the program for almost two years and after the termination petitions had been filed; and he had not begun participating in the Child's therapy.

Further, the Court was not persuaded that Father could resolve his dependency issues in the near future. In almost two years, Father had never moved from or fixed the deplorable home from which the Child was removed and intended on reunifying with the Child in same deplorable home that had seen very little progress, if any. Father was not employed in the months leading up to the termination hearing and at the time of the termination hearing. Father never addressed the concern of domestic violence as the staff of the domestic violence program, MENERGY, requested Father first attend an anger management program due to the conflict that Father created with the MENERGY staff. At the time of the termination and goal change hearings, Father had not demonstrated completion of neither the anger management nor domestic violence programs.

Finally, a child's life may not be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting. In re Adoption of M.E.P., 825 A.2d 1266 (Pa. Super. 2003). Father has shown a "repeated and continued incapacity and refusal" to parent the Child. Father cannot provide a permanent, healthy, safe environment for this Child. Father's lack of action and slothful last minute efforts to gain the ability to parent this Child demonstrate his repeated and continued incapacity, abuse, neglect, and refusal to parent. This Court finds that Father will not be able to resolve the dependency issues in the near future. Consequently, for all of the above reasons this Court terminated Father's parental rights pursuant to §2511(a)(2).

2. **The Trial Court Properly Granted the Petition to Terminate Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(5) and (a)(8).**

Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and

placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. §2511(a)(5).

The requirements to terminate pursuant to section 2511(a)(8) are similar. "[T]o terminate parental rights pursuant to 23 Pa.C.S.A. §2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." In re K.T.E.L., 983 A.2d 745 (Pa. Super. 2009).

The Court found clear and convincing evidence to terminate Father's parental rights pursuant to Sections 2511(a)(5) and (a)(8) for the same reasons discussed above. Particularly, that this Child was removed from the shared home of her Mother and Father with an OPC September 9, 2016 and the Child remained in placement for approximately twenty months by the day of the termination hearing. Furthermore, the conditions that led to the Child's removal (which include: deplorable housing, domestic violence, Father's lack of employment or income verification, and the Child having been a sexual assault victim whose parents did not believe her and did not act appropriately in regards to keeping the Child safe and protected from her perpetrator), had not been alleviated by the time of the termination hearing. In addition, the Court found it was in the Child's best interests to terminate Father's rights because the Child was in foster care for nearly two years and is currently with a pre-adoptive foster parent that has worked towards stabilizing the Child's behaviors, and whom the Child likes and to whom the Child is well-bonded. Moreover, this Court found that the termination of Father's parental rights would not be detrimental to the Child's health, safety & well-being as the Child feared Father.

### B. The Trial Court Properly Found that Termination of Father's Parental Rights was in the Child's Best Interests and That DHS Met Its Burden Pursuant to 23 Pa.C.S.A. §2511(b)[6].

After the trial court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best interests of the child pursuant to 23 Pa.C.S.A. §2511(b). In the Matter of the Adoption of C.A.W. and A.A.W., 453 Pa. Super. 277, 683 A.2d 911, 917-18 (Pa. Super. 1996). In terminating the rights of a parent, the Court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). "Section 2511(b) centers judicial inquiry upon the welfare of the child rather than the fault of the parent." In re K.Z.S., 946 A.2d 753 (Pa. Super. 2008). Further, "[o]ne major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. In re C.T. and G.T.F., 944 A.2d 779 (Pa. Super. 2008).

The Child was nine years old at the time of the hearing, and had been in placement for approximately twenty months with two failed kinship placements but has since resided in pre-adoptive home with an appropriate caregiver. The Court relied on the credible statement of Mr. John Hall, who testified that in his opinion the Child would not suffer any irreparable harm if Father's rights were to be involuntarily terminated. Mr. Hall based his opinion upon the fact that Father poses a grave threat to the Child given his inappropriate aggressive and sexual behaviors towards her during the visits; and also on the fact that the Child does not have a healthy

---

[6] **Other Considerations.**- The Court in terminating the rights of a parent shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

relationship with Father as the Child indicated that she would like to return home to Father so that she could be sexually assaulted again by her brother, the perpetrator of the sexual assault that led to the Child's initial removal and placement. In contrast, Mr. Hall opined that the Child has positive interaction and a close-knit relationship with the pre-adoptive foster parent and that the Child likes the pre-adoptive foster parent so much that the Child's negative behaviors escalated when she was removed from that foster parent and briefly placed in a Respite Home. Additionally, Ms. Shannon Hawkins, whose statements this Court also found credible, testified that the Child and Father do not have a healthy or positive paternal relationship and that the Child would not suffer any irreparable harm if his parental rights were terminated. Ms. Hawkins based her opinion on the inappropriate sexual advances that Father made toward the Child during the visits and the fact that the Child does not talk about her Father at all. Ms. Hawkins concluded that it is best that the Child and Father not have any visits. Lastly, Mr. Raymond Nichols, whose testimony was reliable and persuasive, opined that no positive, healthy paternal relationship exists between Father and Child and that the Child would not suffer an irreparable harm if Father's parental rights were terminated. Mr. Nichols based his opinion on having observed multiple sexual advances from Father toward the Child during visits, and even with re-directing Father's actions, Father still would not listen. Moreover, Mr. Nichols explained that the Child was fearful of her Father and she feared him so much that she would often defecate or urinate on herself before and/or after the visits with Father. Also, Mr. Nichols based his opinion on the fact that during the visits with Father, the Child would revert back to a very child-like stage, unable to have normal discussions while in Father's presence, often looking to Mr. Hall while Father addressed her but not being able to utter anything.

Based upon these facts, this Court concluded that it would be in the Child's best interest to be adopted. Additionally, while Father completed a parenting class, it is obvious that he still does not possess the skills necessary to provide a nurturing, loving home, and to appropriately meet and foster the developmental, physical, and emotional needs and welfare of the Child so she is best served by terminating Father's parental rights.

### C. The Trial Court Properly Found that the Goal Change from Reunification to Adoption was in the Child's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental, and Moral Welfare of the Child Pursuant to 42 Pa.C.S.A. §6351 (f.1)[7]

The Court in terminating the rights of a parent shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child pursuant to 42 Pa.C.S.A. §6351 (f.1). This Court found substantial, sufficient and credible evidence was presented to establish adoption as the appropriate goal in the best interest of the Child. Testimony was presented to show that the Child's behaviors are most stable when in the care of the current pre-adoptive foster parent and that the Child regresses when she is not in the care of the current pre-adoptive foster parent. Not only did the Child's therapist and CUA team recommend that it is best that there be no contact between the Child and Father, visitations with Father were suspended March 14, 2018 and the Child has shown no indication of the suspension having a negative effect on her, rather, the Child has been forthcoming about the sexual abuse she has suffered and otherwise generally does not discuss her Father, as she fears him.

---

[7] 42 Pa.C.S.A. §6351-Disposition of dependent Child-(f.1)- Additional determinations. Based upon the determinations made under section (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) if and when the Child will be placed for adoption, and the county adoption will file for termination of parental rights in cases where return to Child's parent, guardian, or custodian is not best suited to the safety, protection and physical, mental, and moral welfare of the Child.

Individually and collectively, the detailed testimony from Mr. Hall, Ms. Hawkins and Mr. Nichols that the Child does not have a healthy, positive relationship with Father was sufficient to provide the Court with adequate evidence to evaluate the parent-child relationship between Father and the Child. The totality of the evidence, including the exhibits admitted during the trial and past testimony that was incorporated by reference,[8] supports the trial Court's conclusion that termination of Father's parental rights and goal of adoption is in the best interest of the Child.

## CONCLUSION

For the foregoing reasons, the Court finds that DHS met its burden by clear and convincing evidence and respectfully requests that the Decree and Order of June 13, 2018, terminating Father, O.R.'s parental rights pursuant to M.R. and changing the Child's permanency goal to adoption be AFFIRMED.

BY THE COURT:

DEBORAH L CANTY, J.

---

[8] The testimony from the hearings held on 3/14/18 and 5/9/18 were incorporated by reference and are attached hereto. (N.T. 6/13/2018, p. 52 at 25 and p. 9 at 1-3). Also, DHS Exhibits #1-#8 were admitted into evidence at the termination and goal change hearing and are attached hereto. (N.T. 5/9/2018, p. 32 at 2-3).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing OPINION has been served upon the following parties, as set forth below:

**FAMILY COURT MAILBOX**

**Counsel for Mother:**
Lisa Marie Visco, Esquire
206 N. 22nd Street, Unit B
Philadelphia, PA 19103

**Guardian Ad Litem:**
Charles Rosenbaum, Esquire
5924 Torresdale Ave.
Philadelphia, PA 19135

**Child Advocate:**
Yu-Qing (Jane) Kim, Esquire
Support Center for Child Advocates
1617 JFK Blvd. Ste. 1200
Philadelphia, PA 19103

**Counsel for Father:**
Mario D'Adamo III, Esquire
1706 Race Street, Ste. 410
Philadelphia, PA 19103

**Counsel for Department of Human Services:**
Robert Aversa, Esquire
Law Department, Child Welfare Unit
1515 Arch Street, 16th Floor
Philadelphia, Pa 19102

8/24/18
Date

Deborah L. Canty, Judge